898 So.2d 419 (2004)
Lauraleigh Cefalu PIERRE
v.
Andrew R. PIERRE.
No. 2004 CU 1496.
Court of Appeal of Louisiana, First Circuit.
December 30, 2004.
Writ Denied February 16, 2005.
*420 Hobart O. Pardue, Jr., Springfield, for Plaintiff-Appellant Lauraleigh Cefalu Pierre.
Dennis John Hauge, Prairieville, for Defendant-Appellee Andrew R. Pierre.
Before: FOIL, PARRO, and KUHN, JJ.
PARRO, J.
In this child custody case, Lauraleigh Cefalu Pierre (Cefalu) appeals a judgment in which the district court awarded visitation rights with her children to her ex-spouse, Andrew R. Pierre (Pierre), despite having terminated Pierre's parental rights in the same judgment. After a thorough review of the unusual factual considerations and legal issues of this case, we vacate the judgment in part and affirm it in part.

BACKGROUND
Cefalu and Pierre were married June 1, 1994. During their marriage, Cefalu gave birth to two children, Kaitlyn Elizabeth, born April 28, 1998, and Andrew Robert Pierre, II, born September 8, 1999. Cefalu and Pierre separated in January 2002, and after living separate and apart without reconciliation for over six months, were divorced September 25, 2002. The parties stipulated to joint custody of the minor *421 children; the divorce judgment reflects their agreement concerning custody, visitation, and support.
On April 17, 2003, Pierre filed a rule for contempt, alleging Cefalu had refused to allow him visitation and seeking enforcement of his joint custody and visitation rights. Cefalu responded with a motion to suspend visitation, claiming her son had returned home after visiting Pierre the weekend of May 30 through June 2, 2003, exhibiting "signs of molestation." In response to her motion, a temporary restraining order was issued ex parte on June 3, 2003. After a hearing, a stipulated judgment was signed on August 11, 2003, rescinding the temporary restraining order and reinstating all provisions of the judgment of divorce concerning visitation and child support. This judgment further ordered the appointment of a family therapist, Steven Thompson, to conduct evaluations of the parties and the minor children and report his findings to the court, after which a hearing would be held.
Those evaluations were performed, and the key factor subsequently influencing the course of this case was disclosed in Thompson's report[1] concerning Pierre, as follows:
[Pierre's] important medical history includes the fact that he was born female and subsequently had partial surgery to facilitate anatomical sex change. In addition, he has undergone a regimen of drug therapy to facilitate an accompanying change in hormonal balance. Further, in preparation for anticipated surgery and as a follow-up to the surgery, he has secured counseling and appropriate medication from mental health professionals. The possibility of surgery was first addressed at age nineteen and the surgery was completed prior to his contact with Lauraleigh Cefalu.
Pierre reported to Thompson that he and Cefalu had discussed this fact before their marriage, so she was fully aware of the anatomical changes that had been surgically made. Thompson's report indicated Pierre believed the sex change had become an issue since their divorce because of the influence of Cefalu's parents and her boyfriend, Dan Marler, who was by that time living with her and the children.[2]
Cefalu told Thompson she believed Pierre's birth certificate would show his status as a female, disqualifying him from being legally recognized as the children's father. She denied discussing this with Pierre before they were married. She said she first became aware of Pierre's true gender in the summer of 2000, when she met a woman looking for "a sister" who had been given up as an infant for adoption. The "sister" turned out to be Pierre. Cefalu claimed her sexual naivete and Pierre's manipulation of their sexual intimacies kept her from discovering the truth. Both children were born as the result of artificial insemination. According to the report, Cefalu did not want the children to know Pierre as their "father," because that was "not normal," but did not mind if they spent time with Pierre. Thompson's report stated he did not believe that Cefalu, an intelligent woman with a Bachelor's degree in psychology and a Master's degree in counseling, could have been deceived as she claimed. He commented, "[T]his evaluator is not persuaded that Lauraleigh Cefalu is being *422 honest with herself, honest with this evaluator, [or] honest with the court."
Based on his examination of the children, Thompson concluded both showed normal development and appeared to be doing remarkably well, given the stresses they were under as a result of the divorce and custody dispute. He thought it was appropriate for them to continue with psychological counseling to deal with those stresses. Thompson found nothing in their words or actions to suggest they should not continue to enjoy a close relationship with both parents. According to the report, the children were very positive toward both parents, and neither communicated any information that would be cause for concern. The report further stated:
Should the court, legal counsel, or any other party become distracted by the issues surrounding sexual organs under the law, the primary issue of the welfare of the minor children will become lost. Throughout the evaluation, the parties tended to over focus on the issue of sexual anatomy with limited acknowledgment of the parental roles that each has served in the lives of these two minor children. Lauraleigh Cefalu would like Andrew Pierre "removed" as the father of the minor children. Andrew Pierre and Lauraleigh Cefalu entered into a contract, which set the stage for their parenting of the two minor children as mother and father. These two children have lived with that system since birth and any change in those designations or roles would be harmful to these children.
Thompson's report to the court recommended continuation of joint custody, with Lauraleigh as the domiciliary parent and frequent, structured visitation for Pierre. It also recommended continuation of the children's psychological counseling, participation in a cooperative parenting and divorce class by Pierre and Cefalu, and the appointment of a mental health professional to monitor the parties' compliance with the eventual judgment of the court. The report was dated October 13, 2003, and was filed in the record February 23, 2004.
On February 25, 2004, Cefalu filed a rule to terminate visitation and joint custody, alleging her marriage to Pierre was absolutely null, because at the time of their marriage, they were of the same sex and could not legally contract marriage with each other in this state. She further suggested that a purported marriage between parties of the same sex did not produce any civil effects. For this reason, and also because Pierre had no biological tie to the children, she requested the termination of his right to visitation and obligation of support. Pierre opposed the motion in a brief filed the same day, and a contradictory hearing was conducted on the same day, February 25, 2004.[3]
As predicted by Thompson's report, which was jointly submitted at the hearing, the court, legal counsel, and parties became "distracted by the issues surrounding sexual organs," as this was the predominant topic of the parties' testimony. Cefalu claimed she did not know about Pierre's anatomical deficiencies until after they were separated, having been deluded by him with the help of mechanical contrivances during the entire seven-plus *423 years of their marriage.[4] Pierre disputed this, stating that they had discussed the situation before their marriage, that Cefalu understood the limitations of Pierre's genitalia, and that she knew this was why artificial insemination was necessary for them to have children. Pierre indicated that sometime after the surgery and before the marriage, the sexual designation on his birth certificate had been changed from female to male.[5] There was no evidence showing either Cefalu or Pierre was unfit to be a parent; in fact, Thompson's report indicates the contrary. Neither was there any showing of a change in their circumstances since the divorce judgment was rendered, in which they stipulated to joint custody of the children.
Following that hearing, the trial judge stated in oral reasons:
I find it incredulous that that young lady would get on that witness stand and say that they were married all of those years and she didn't know about the genitals. I'm sorry, I find that unbelievable. I don't find that credible. It really does not enter into my thinking in making my decision, but I don't buy that, I'm sorry, I don't buy it.
It comes down to a legal issue as to the parental rights. And I'm aware of what the other states are doing. However, in the State of Louisiana or at least in the 21st [judicial district], or ... even more in Division "D", I'm not willing to go in that direction. I don't think that we've reached the point now, in this jurisdiction where the situation we have, I don't condemn, good, bad or indifferent, but the situation, the facts that we have in this case, warrant Andrew having parental rights. And therefore, based on that, and understand I have a legal and factual thing.
In the legal situation, I would find that in fact, these children are [Cefalu's] children and she is to have sole custody. But, but the law also recognizes the need for the best interest of the children.... I don't think anybody disagrees that Mr. Pierre has a loving relationship with the children, they've visited, [with Cefalu's] consent, she allowed them to visit.... Had the visitation, cared for the children, obviously loves the children, there's no doubt about it. So, to come in and say, we're going to cut him off forever, I can't go that far, either. I think that the best interest of the children warrant that he, at least be entitled to have some visitation with those children.
Therefore, based on that, while I do terminate the parental aspect, the parental rights of Mr. Pierre, in this situation, based on what we've discussed, I find that it is in the best interest of the children that he maintain visitation with them.
*424 A judgment in accord with these reasons was signed March 8, 2004. Cefalu appeals, claiming the judgment is internally inconsistent by terminating Pierre's parental rights, while allowing continued visitation. She seeks reversal of the portion of the judgment that allows Pierre to continue visitation with the children. Pierre's appellate brief asks this court to affirm the visitation order, but assigns as error the termination of parental rights on the sole basis that he is the same sex as the biological mother. Pierre seeks reversal of that portion of the judgment only.

DISCUSSION

Appeal Procedure and Jurisdiction
Before addressing the substantive issues, we must discuss procedural and jurisdictional matters affecting this court's review in this appeal. Pierre did not file an appeal of the judgment. Pierre's brief to this court shows an intent to answer the appeal in order to have the judgment modified, revised, or reversed in part, and to have a more favorable judgment rendered on the issue of parental rights. However, the brief did not accomplish that intent. See LSA-C.C.P. art. 2133(A). Article 2133(A) states that a party seeking such relief must file an answer to the appeal, stating the relief demanded; it must be filed not later than fifteen days after the return day or the lodging of the record, whichever is later. The return day was July 8, 2004; the record was lodged July 2, 2004. Pierre's brief was not filed until August 20, 2004, and therefore, was untimely and could not serve as an answer to the appeal.[6] A party who has not appealed or answered the appeal may not seek to have the trial court's judgment modified in its favor. Heck v. Lafourche Parish Council, 02-2044 (La.App. 1st Cir.11/14/03), 860 So.2d 595, 602, writ denied, 04-0067 (La.3/19/04), 869 So.2d 837. Due to Pierre's failure to appeal or answer the appeal, this court generally could not grant the relief requested concerning the termination of parental rights, but would be limited to affirming the judgment or reversing it, as requested by Cefalu.
However, a court's lack of jurisdiction over the subject matter before it may be raised at any stage in the proceedings, either by the parties or by the court on its own motion. See LSA-C.C.P. arts. 1, 2, 3, and 925(C); Whittenberg v. Whittenberg, 97-1424 (La.App. 1st Cir.4/8/98), 710 So.2d 1157, 1158. The district court in this case was trying the issues of child custody and visitation, which are matters incidental to the divorce between the parties and are within the court's jurisdiction. LSA-C.C. arts. 131-136. But the termination of parental rights is not one of the issues incidental to divorce that is within the jurisdiction of the district court. Rather, voluntary or involuntary termination of parental rights is a matter over which a court exercising juvenile jurisdiction has exclusive original jurisdiction. LSA-Ch.C. arts. 303(5) & (6) and 307(A)(3) & (A)(4). Moreover, even though the district court may exercise original juvenile jurisdiction where there is no separate juvenile court in the district, when that court is sitting as a district court, it cannot entertain jurisdiction of cases cognizable only in the juvenile court. See State v. Laborde, 233 La. 556, 97 So.2d 393 (1957); Griffith v. Roy, 263 La. 712, 269 So.2d 217 (1972).
Furthermore, even in actions to declare the nullity of a marriage, there is no authority *425 for the district court to terminate parental rights.[7] On the contrary, even if a court determines in such an action that a party is not entitled to the civil effects of marriage, that party may still be awarded custody, child support, or visitation. See LSA-C.C. art. 152. There are simply no provisions in our law under which a district court has subject matter jurisdiction to terminate parental rights under these circumstances. Therefore, although Pierre did not appeal the termination of his parental rights and did not raise that issue in an answer to the appeal, we find on our own motion that the district court lacked jurisdiction over the subject matter of this issue. Therefore, the portion of the judgment that terminated Pierre's parental rights is void and must be vacated by this court. See LSA-C.C.P. art. 3; Whittenberg, 710 So.2d at 1160.

Visitation
As previously noted, the custody determination was not appealed by either party; the only issue before this court on appeal is the propriety of the visitation awarded to Pierre, which was raised by Cefalu's appeal. Under LSA-C.C. art. 136(A), a parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child.[8] Every child custody case must be viewed in light of its own particular set of facts. Dettman v. Rablee, 01-1228 (La.App. 1st Cir.9/28/01), 809 So.2d 373, 377. The trial court is in the best position to ascertain the best interest of the child, given each unique set of circumstances. Bercegeay v. Bercegeay, 96-0516 (La.App. 1st Cir.2/14/97), 689 So.2d 674, 676. The trial court is vested with vast discretion in matters of child custody and visitation. Accordingly, its determination regarding these issues is entitled to great weight and will not be disturbed on appeal unless an abuse of discretion is clearly shown. Stephens v. Stephens, 02-0402 (La.App. 1st Cir.6/21/02), 822 So.2d 770, 774.
Applying these precepts to the facts in the matter before us, the trial court determined that the best interests of the children would be served by having continued visitation with Pierre. The court noted that Pierre "obviously loves the children"; the evidence showed Pierre supported them emotionally and financially ever since their births. Thompson's report confirmed the positive quality of the relationship between Pierre and the children, and stated that "the children like everyone." Pierre's testimony and the history of the previous custody and visitation arrangements between Pierre and Cefalu demonstrate Pierre has always been willing to encourage and support the close relationship between the children and their mother; it is only Cefalu who has recently tried to discourage their relationship with Pierre. The trial court indicated *426 its conclusions concerning the best interests of the children were based on Thompson's report, which stated unequivocally that the mental and physical health of the children supported a continuing relationship with both parents. In determining the best interests of the children, the court observed that it was "somewhat disingenuous" for Cefalu to come to court after agreeing to joint custody and visitation and say now, "I don't want you to have any visitation."
The trial court's discomfort concerning Cefalu's position is understandable, given the jurisprudence concerning the requisites for changing custody that has been awarded pursuant to the stipulation of the parties. Generally, if a prior award of custody has been made by consent decree, the proponent for change must show that a material change in circumstances affecting the child's welfare has occurred since the last custody judgment before the court will consider a change in custody. Bergeron v. Bergeron, 492 So.2d 1193, 1200 (La.1986); Millet v. Andrasko, 93-0520 (La.App. 1st Cir.3/11/94), 640 So.2d 368, 370-71. Even if a non-parent has been awarded custody by consent decree, the parent moving for a change or modification must show a change in circumstances and that the change in custody would be in the best interest of the child. Robert v. Gaudet, 691 So.2d 780, 783 (La.App. 1st Cir.3/27/97). In the case we are reviewing, there was a prior award of joint custody, and Cefalu sought the change to sole custody. Even though Pierre is not the biological parent of the children, there was an award of joint custody by consent between the parties, and there was no showing of a change of circumstances impacting the children between the time that award was made and the time of the hearing. Under the jurisprudence, therefore, Pierre might have been entitled to continue as a joint custodian of the children, as well as to enjoy continued visitation.
However, for the reasons previously discussed, the change of custody issue is not before us in this appeal; we are limited to affirming or reversing the award of visitation. Under the circumstances, we find no manifest error in the court's factual findings and no abuse of discretion in its decision to allow Pierre continued visitation with the children. Nor is the visitation ordered by the court unreasonable or an abuse of the court's discretion.

CONCLUSION
The portion of the judgment terminating Pierre's parental rights is vacated. In all other respects, the judgment is affirmed. All costs of this appeal are assessed to Cefalu.
JUDGMENT VACATED IN PART AND AFFIRMED IN PART.
FOIL, J., concurs in the result.
KUHN, J., dissents in part and concurs in part and assigns reasons.
KUHN, J., dissenting in part.
Law and public policy dictate that I must disagree with that portion of the opinion which concludes the trial court did not abuse its discretion when it awarded visitation to Andrew Pierre.
It is a well-settled prohibition provided for by the Louisiana Civil Code that persons of the same sex may not contract marriage with each other. See La. C.C. art. 89. A marriage is absolutely null when contracted in violation of an impediment. La. C.C. art. 94. Furthermore, a purported marriage between parties of the same sex does not produce any civil effects. La. C.C. art. 96.
*427 A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. C.C. art.1906. A contract is absolutely null when it violates a rule of public order. And an absolute nullity may be invoked by any person or may be declared by the court on its own initiative. La. C.C. art.2030.
The purported marriage between Pierre and Lauraleigh Cefalu is an absolute nullity that the court should raise on its own initiative. And the purported agreement whereby, in an attempt at reaching a stipulated judgment, they agreed to joint custody of Cefalu's minor children (in conformity with a document described as a "judgment of divorce") is also an absolute nullity that the court should raise on its own initiative.
That Pierre underwent a surgery partially changing her sexual appearance and undertook a regimen of drug therapy to facilitate an accompanying change in her hormonal balance does not alter the facts: Pierre was born a female and continues to have female chromosomes. By voluntarily undertaking a surgical procedure to partially alter her physical appearance and introducing drugs to change her hormonal balance, Pierre does not  and cannot  automatically confer upon herself a new status as well; this is particularly so insofar as her right to enter into a marriage. See La. C.C. art. 3519 comment (a) (explaining Louisiana's Civilian-rooted meaning of "status" and, referencing M. Plainiol, Traite elementaire de droit civil v. 1 s 419 (English translation by Louisiana Law Institute 1959), defining "status" to include "those attributes of a person which the law takes into consideration in order to attach juridical effects to them"). I am not convinced that because Louisiana law provides for a detailed procedure allowing a person's name and gender to be changed on a birth certificate after a sexual reassignment surgery has been undertaken, see La. R.S. 40:62, the legislature has expressed its intent to confer an accompanying change in the legal status of a person who has chosen to surgically alter his or her appearance. Reading La. R.S. 40:62 in its entirety, it is no more than an administrative adjustment of the state's procedure for issuance of birth certificates.[1] The trial court committed legal error when it failed to recognize the impediment to the marriage between Cefalu and Pierre and should have declared the purported marriage an absolute nullity.
Because the purported marriage between Cefalu and Pierre is absolutely null, Pierre is not legally presumed to be a parent of Cefalu's children, see La. C.C. art. 184, and clearly cannot prove any biological connection with them. Thus, the provisions of La. C.C. art. 136 A, which entitle the noncustodial parent to reasonable visitation, do not apply to Pierre and cannot be cited as support for the trial court's award of visitation to her. That the purported marriage is absolutely null also precludes Pierre from asserting entitlement to visitation under the provisions of La. C.C. art. 136 B either (allowing for reasonable visitation rights to a relative by *428 affinity or a former stepparent under extraordinary circumstances).
For these reasons, I believe the trial court committed legal error and would reverse the award of visitation to Pierre. I agree with the majority, however, that the trial court had no jurisdiction to consider termination of parental rights. After all, Pierre is not a parent of these children either biologically or legally by presumption or adoption.
NOTES
[1] The report was also signed by Christine Belaire, Ph.D., who, like Thompson, was a licensed professional counselor, as well as a licensed marriage and family therapist. She apparently participated in the evaluation process. For convenience, we will refer to their report as Thompson's report, since he was the court's appointed expert.
[2] Cefalu and Marler have since married.
[3] Although Cefalu's motion and Pierre's opposition were both filed on the same day as the hearing on the motion, the parties had exchanged these documents prior to the hearing. The hearing date had already been set to consider the pending contempt rule by Pierre that had been continued; the new issues raised by Cefalu's motion were also tried at that time.
[4] This testimony conflicted with her statement in Thompson's report that she first learned of Pierre's situation in the summer of 2000. It also conflicted with her earlier testimony that she found out sometime in 1998, while she was pregnant with her second child, that Pierre had been a female at birth.
[5] Louisiana law recognizes that sex change surgery does occur and allows the person's name and gender on the birth certificate to be changed accordingly. The detailed procedure for accomplishing such a change is set out in LSA-R.S. 40:62. The record shows that a copy of Pierre's birth certificate was requested by the court and was examined in camera and under seal, pursuant to the court's order, before the hearing in February 2004. That document was not in the record sent to this court. However, the revised birth certificate must have shown Pierre's gender as male (and Cefalu's as female) in order for the clerk of court to issue a marriage license to the couple in 1994.
[6] We express no opinion as to whether the brief itself could somehow have served as an answer to the appeal, had it been timely.
[7] We note further that although Cefalu argued that the marriage was absolutely null as a reason to change custody and terminate Pierre's parental rights, the issue of the nullity or validity of the marriage formerly existing between these parties has not been litigated and is not before this court in this appeal. The record does not indicate that an action to declare the nullity of the marriage has been instituted, nor does it contain evidence upon which such a determination could be made. The current status of the matter, therefore, is that a valid marriage existed between these parties until it was dissolved by divorce.
[8] We note further that although Cefalu argues Pierre cannot be the parent of her children, and therefore, should not have visitation rights, Article 136(B) establishes criteria under which reasonable visitation may be granted to persons who are not parents and are not biologically related to the child, if the court finds that it is in the best interest of the child to do so.
[1] Louisiana Revised Statute 40:62 C provides for "the issuance of a new birth certificate changing the individual's sex designation." (Emphasis supplied.) Thus, by the express terms of the state's procedure, it is a new certificate which issues so as to cause the changing of the designation of the petitioner's sexual classification from one gender to another on the newly-issued certificate. And the original birth certificate is not destroyed but placed in the archives of the vital records registry. See La. R.S. 40:62 D(1). Thus, inherent in the state's birth certificate issuance procedure is recognition that the petitioner is a member of the pre-operative sex.